J-S54044-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.L.L. (ADOPTEE'S NAME AS ON BIRTH CERTIFICATE) | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.F.F. | : : : : : | No. 600 WDA 2017 |

Appeal from the Order Entered March 14, 2017
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 113 of 2016

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.N.L. (ADOPTEE'S NAME AS ON BIRTH CERTIFICATE) | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.F.F. | : : : : : | No. 601 WDA 2017 |

Appeal from the Order Entered March 15, 2017
In the Court of Common Pleas of Westmoreland County
Civil Division at No(s): 112 of 2016

BEFORE: OTT, MOULTON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.: **FILED OCTOBER 27, 2017**

S.F.F. ("Mother") appeals from the orders granting the petitions filed

by R.L.L. ("Father") and J.D.L. ("Stepmother") and involuntarily terminating

Mother's parental rights to her minor children, D.N.L., a female born in April

_____

[*] Former Justice specially assigned to the Superior Court.

of 2008, and D.L.L., a male born in April of 2009 (collectively, "Children").[1]

Mother claims that the trial court erred in terminating her parental rights

under 23 Pa.C.S. § 2511(b). For the following reasons, we affirm.

The orphans' court summarized the relevant factual background as

follows:

> [Mother and Father] lived together with [Children] in Radford, Virginia from their birth until the parents became involved with Children and Youth Services in Virginia, at which point [C]hildren were placed in foster care for approximately one (1) year. When [Children] were returned to the care of their biological parents, Father and [Mother] had separated, with [Mother] residing in Virginia and Father residing in Tennessee and subsequently, Pennsylvania. The parents shared custody informally from this point onward, with [Children] residing primarily with [Mother] in the Commonwealth of Virginia for approximately three (3) years, until March of 2014.
>
> At this time, [Mother's] then-paramour contacted the Father and [Stepmother], requesting that they immediately assume custody of [Children]. [Mother's] paramour asserted that this was necessary due to [Mother's] ongoing methamphetamine and other drug-related issues, and her resulting inability to properly care for [Children]. [Mother] produced a letter stating her intention to transfer full custody of [Children] to Father and [Stepmother], and the same was signed by [Mother] and notarized on March 21, 2014. [Children] relocated to Father's residence in Westmoreland County, Pennsylvania, where they have resided since, under the care of Father and his wife.

---

[1] On May 10, 2017, this Court entered an order *sua sponte* consolidating Mother's two appeals – each challenging the orders terminating Mother's parental rights to Children – for a single decision. *See* Pa.R.A.P. 513.

A Custody Order of Court was entered in Westmoreland County on February 2, 2015 at Docket Number 2122 of 2014-D, between Father and [Mother]. The Order provided for sole legal and primary physical custody of [Children] to Father, with a daily phone call between 7:00 p.m. and 7:30 p.m. and supervised visitation provided to [Mother]. [Mother] never challenged or attempted to enforce any provision of this Order.

Mother's contact with [Children] since their relocation to Westmoreland County in March of 2014 has been sporadic at best. From March of 2014 until February of 2015, Father testified that [Mother] would call [Children] inconsistently, often going weeks at a time without contact. In this time period[,] Mother visited [Children] approximately three (3) to five (5) times. Father stated that [Mother] was often inattentive during these visits, and would often spend significant amounts of time arguing with her boyfriend or sleeping, although [Mother] blamed her torpor on the long drive between Virginia and Pennsylvania.

Subsequent to the February 2, 2015 Custody Order, [Mother's] contact continued to be sporadic, and Father reports that [Mother] would often call at inappropriately late times, with weeks and occasionally months between phone calls. [Mother] also expressed to [Stepmother] that she did not feel that she needed to be sober when contacting [Children]. Father indicated that neither he nor his wife indicated that they did or would have refused any contact from [Mother], provided that she was sober at the time. [Stepmother] noted that following these sporadic contacts with [Mother], [Children] would often experience short periods of acting out and/or bedwetting, which would then have to be addressed in their therapy sessions.

[Mother's] last in-person contact with [Children] occurred in July of 2015, when she attended a visit with [Children] at Father's home. [Mother's] last contact of any sort with [Children] occurred on April 23, 2016. [Mother] contacted [Children] via text message on that date, in relation to D.L.L.'s birthday. Father testified to receiving

no contact in any form from [Mother] since that date. [Stepmother] corroborated this statement.

[Mother] testified that she attempted to make contact with Father and [Stepmother] via Facebook Messenger between December of 2015 and April of 2016. [Stepmother] testified to some attempts at contact by [Mother], however she stated that she did not find it appropriate for [Mother] to talk to [Children] while she was using illicit drugs, and [Mother] confirmed that she was using drugs during a significant portion of this time period. [Mother] did have text message contact during this time, up until April 23, 2016, as indicated above. [Mother] testified that she never petitioned the [c]ourt to enforce any provision of her Custody Order during this time period in order to reestablish regular contact with [Children].

[Mother] was subsequently incarcerated [at] New River Valley Regional Jail in the Commonwealth of Virginia on April 28, 2016. A detailed exploration of the charges and the surrounding situation was conducted on the record. During her incarceration, [Mother] claims to have written letters to [Children], Father, and [Stepmother], which she claims she provided to Father's step-father's current wife. She stated that she requested that these letters be passed along to Father for dissemination, as she was unable to access Father's address while in prison. Father and [Stepmother] deny having ever received these letters. Additionally, Father's step-father [sic] testified to having no knowledge of the contents of any correspondence between [Mother] and his wife.

Father testified credibly that [Children] do not inquire after [Mother] or bring her up in conversation, and they have not done so since phone contact ceased completely. Father stated that D.L.L. previously expressed trepidation when [Mother] came to visit, and that her visits made him feel afraid. Father additionally stated that D.L.L. was even "scared to death," to the point of physically shaking, prior to the February 16, 2017 hearing because he was afraid of coming in contact with [Mother]. Father reports that D.N.L. harbors a similar fear of [Mother], and that [Children] have worked over the course of years in therapy to overcome traumas that they incurred while in [Mother's]

- 4 -

primary custody. These traumas allegedly include being locked in rooms by [Mother] and being taken to strangers' houses while [Mother] and the individuals present used various illicit substances. [Mother] denies these allegations.

Father enrolled [Children] in mental health treatment in July of 2014 to address their emotional and behavioral issues. D.N.L has recently been successfully discharged from her individual therapy, and D.L.L. is currently still involved in the same. Father noted that the therapy has been a success, and that [Children] are currently thriving. [Children] currently have exceptional grades, with D.L.L. obtaining straight As and D.N.L. obtaining As and Bs. They are both involved in extracurricular activities, with D.L.L. participating in baseball and D.N.L. participating in cheerleading.

Orphans' Ct. Op., 5/12/17, at 2-5.

On October 25, 2016, Father and Stepmother filed a joint petition to involuntarily terminate Mother's parental rights to Children.[2] The trial court appointed counsel for Children, referred to as the guardian *ad litem*.[3] On February 16, 2017, the orphans' court held a hearing on the petition. The

_____

[2] The Adoption Act required Father in his petition to involuntarily terminate Mother's parental rights to Children to "aver that an adoption is presently contemplated [and] that a person with a present intention to adopt exists," and the record reflects that he complied with this requirement. **See** 23 Pa.C.S. § 2512(b); **In re E.M.I.**, 57 A.3d 1278, 1285 (Pa. Super. 2012); **see also** Pet. for Involuntary Termination of Parental Rights, 10/25/16, ¶ 8.

[3] There is a distinction between counsel in a proceeding to terminate parental rights, who must represent a child's legal interests, and a guardian *ad litem*, who represents a child's best interests. **See In re Adoption of L.B.M.**, 161 A.3d 172, 181 (Pa. 2017). However, as set forth below, the record here does not evince a conflict between Children's legal interests and their best interests.

orphans' court entered its findings of fact and orders terminating Mother's parental rights on March 14, 2017. On April 13, 2017, Mother filed her timely notice of appeal and concise statement of errors complained of pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother presents the following issues for our review:

> I. Whether the [orphans'] court erred as a matter of law in granting the [p]etition for [i]nvoluntary [t]ermination of [p]arental [r]ights regarding birth mother[ ]?
>
> II. Whether the [orphans'] court erred as a matter of law and abused its discretion in finding that no parent-child bond existed between birth mother and [C]hildren?
>
> III. Whether the [orphans'] court erred as a matter of law by failing to consider whether the parent-child bond could be severed without irreparable harm to [C]hildren?

Mother's Brief at 4.

We review an appeal from the termination of parental rights in accordance with the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, [ ] 9 A.3d 1179, 1190 ([Pa.] 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, 36 A.3d 567[, 572 (Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [ ] 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, [ ] 838 A.2d 630, 634 ([Pa.]

- 6 -

2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [ ] 650 A.2d 1064, 1066 ([Pa.] 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

Termination of parental rights is governed by statute, 23 Pa.C.S. § 2511, which requires a bifurcated analysis. First, the orphans' court must examine the parent's conduct. *See, e.g., In re A.L.D.*, 797 A.2d 326, 339 (Pa. Super. 2002). The burden of proof is on the petitioner to establish by clear and convincing evidence the existence of grounds for termination under section 2511(a). *In re J.L.C.* 837 A.2d 1247, 1251 (Pa. Super. 2003). If termination is found by the orphans' court to be warranted under section 2511(a), it must then turn to section 2511(b), and determine if termination of the parent's rights is in the child's best interest. *In re Adoption of R.J.S.,* 901 A.2d 502, 508 (Pa. Super. 2006). "If the court's findings are supported by competent evidence, we must affirm the court's

- 7 -

decision, even if the record could support an opposite result." ***In re Z.P.***, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to section 2511(a)(1), (2) and (b), which provides as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> > *   *   *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), & (b).

Mother's brief contains no argument regarding the trial court's decision under Section 2511(a). *See* Appellant's Brief at 9. Because Mother makes no attempt to develop a legal argument in support of her challenge under subsection (a), we find it waived. *See Chapman-Rolle v. Rolle*, 893 A.2d 770, 774 (Pa. Super. 2006) (stating, "[i]t is well settled that a failure to argue and to cite any authority supporting an argument constitutes a waiver of issues on appeal" (citation omitted)).

We next consider the trial court's determination under Section 2511(b). Mother argues that the orphans' court abused its discretion and erred as a matter of law because "[a]t no time during the hearing did [Father and Stepmother] offer any expert evidence as to whether in fact a bond did or did not exist between [Mother] and [Children]." Mother's Brief at 10. Mother asserts that a bond did exist between her and Children, and terminating her parental rights would cause irreparable harm to Children. *Id.* at 11-12.[4] We disagree.

_____

[4] Mother also suggests that the guardian *ad litem* was not convinced that it was in Children's best interest to sever their relationship with Mother. Mother's Brief at 10 (citing N.T., 2/16/17, at 218). However, the record reveals that the guardian *ad litem* offered the following conclusions:

> [Guardian *ad litem*]: . . . I had hoped that I could have gotten more solid feedback from other professionals involved in this case, which I could not. For whatever reason, I'm not sure. But without that, I'm also not convinced that it is in [Children's] best interests to sever the relationship with [Mother].

*(Footnote Continued Next Page)*

It is well settled that

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether

*(Footnote Continued)* ────────

> With that being said, I also feel that [Mother's] sobriety is quite limited at this point, with the majority of it having been . . . obtained while she was incarcerated. [To the court:] Do you want an opinion from me as to where I stand ultimately?
>
> THE COURT: Absolutely. That's what your purpose is. Thank you.
>
> [Guardian *ad litem*]: Okay. Considering all the evidence, I feel that it would be in [Children's] best interest to do the termination of parental rights, your Honor.

N.T. at 218-19.

We further note that the guardian *ad litem* has declined to file a separate brief in these matters but joined Father and Stepmother's appellee's brief.

any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations and quotation marks omitted). This Court has repeatedly held that expert testimony is not required for the orphans' court to determine if there is a positive bond between a parent and her children. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

Instantly, the orphans' court found that "there [was] no bond whatsoever between [Mother] and [Children]" and that terminating Mother's parental rights to Children will not have "any negative effect on either child, and indeed might further serve their stability with regard to mental health." Orphans' Ct. Op. at 10. We conclude that the record supports the court's findings.

Father testified that D.L.L. was "scared to death" to attend the termination hearing because "he didn't want to be around [Mother]." N.T. at 36-37. Moreover, Father testified that Mother has not had any visits with Children since July of 2015 or any telephone contact since April of 2016. *Id.* at 59. Father also noted that during the few and sporadic visits Mother had with Children prior to July of 2015, Mother did not engage with Children and often spent her visitation time sleeping or with her boyfriend. *Id.* at 37.

Stepmother likewise testified that Children would react poorly to contact or visits with Mother. Specifically, Stepmother indicated that Children would wet the bed the night after a visit or telephone call with Mother. *Id.* at 74. Children would also act out at school in the days

- 11 -

following a visit from Mother. *Id.* at 74-76. Moreover, Stepmother testified that she loves Children like they are her own and would like to adopt Children. *Id.* at 78.

Both Father and Stepmother testified to their concerns that Mother was using drugs when attempting to contact Children and during some of her visits in 2014 and 2015. Stepmother, in particular, recounted an incident when Mother appeared to be dozing off while driving with Children in the car and later vomited at home.

Mother denied Father and Stepmother's allegations that she was using drugs when attempting to contact Children or during visits. Mother testified that she was tired during some of her visits due to the long drive from Virginia to Pennsylvania. She conceded that she got sick on one occasion, but explained that it was due to the sugary snacks she had with Children that day. *Id.* at 144-45. Mother recounted her activities with Children, including watching movies, playing Disney board games, shopping at the mall, and going out with Children around the neighborhood, and contradicted Father and Stepmother's testimony that they always supervised her visits with Children. *Id.* at 141-42. Mother testified that Father and Stepmother began refusing to answer her phone calls in July of 2015. *Id.* at 145-46.

Of particular note, the parties' testimony established that Mother had attempted to spend the summer of 2014 with Children in Virginia. *Id.* at 56. However, shortly after Children arrived, Mother called Father and Stepmother and requested that they bring Children back to Pennsylvania.

***Id.*** Approximately one month after this episode, Father placed Children into therapy. ***Id.*** at 57. Children have responded well, resolving their bedwetting problems, no longer acting out at school, and maintaining good grades. ***Id.*** at 75-77.

Thus, there is support for the trial court's determination that a beneficial bond no longer existed between Mother and Children. Expert testimony, therefore, was not required. ***See In re K.K.R.-S.***, 958 A.2d at 533. Moreover, given Father and Stepmother's testimony, which the orphans' court found credible, the evidence presented supports a finding that terminating Mother's parental rights would best serve Children's needs and welfare under section 2511(b). ***See In re Z.P.***, 994 A.2d at 1116. Mother is not capable of parenting Children safely due to her failure to remedy her drug abuse for any appreciable amount of time. In addition, Children are bonded with Father and Stepmother, with whom they have lived for the past three years. It was within the discretion of the orphans' court to conclude that the benefits of permanency through adoption would outweigh whatever harm Children might experience if their relationship with Mother ended. As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d at 513.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Mother's parental rights to Children.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/27/2017